# CIRCUIT COURT OF THE CITY OF RICHMOND

Charles W. Gigante
and C. W. Gigante
& Assocs., Inc.

v.

Target, Inc.,
and Brett E. Fields

April 13, 2000

Case No. LF-1883-3

BY JUDGE T. J. MARKOW

The parties appeared on Defendants Target, Inc.'s, and Brett E. Fields' Demurrer to Amended Motion for Judgment (AMJ) and a memorandum in support was received and argument was heard.

Upon demurrer, the court accepts all properly pleaded material facts as true. They are those expressly alleged, those impliedly alleged, and those reasonably inferred from the facts alleged. *See CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22 (1993).

This case arises from termination of the contractual relationship between C. W. Gigante & Associates, Inc., a Virginia corporation licensed to sell insurance in Virginia, headed by Charles Gigante, President of CWGA, who is also licensed to sell insurance in Virginia, and Target, Inc., a Virginia corporation, headed by Brett Fields, who was President of Target during the period relevant to this action. The contract is attached to the AMJ.

On December 20, 1994, Gigante and Fields entered into an agreement by which Gigante was given exclusive rights to act as representative for insurance products sold in Southern Virginia, North Carolina, and South Carolina. Fields was acting as agent for Preferred Financial Corporation and its subsidiary, Colorado Bankers Life Insurance Company, the issuers of what the court will refer to as primary insurance products. Gigante's compensation would come from a percentage of the premiums as set out in Schedule A of the agreement. The commissions would be payable when earned by Fields beginning with the first year and continuing in each renewal year. The compensation would terminate if the aggregate of all renewal commissions fell to $50 or less for two consecutive months.

The court infers that both Fields and Gigante later became presidents of their respective companies, CWGA and Target, and assigned their rights and obligations under the December 1994 agreement to their respective companies. Pursuant to the agreement's terms, CWGA entered into numerous agreements with people to whom the AMJ refers as "subagents," individuals who were to act as agents for CWGA.

CWGA searched for and sold complementary insurance products offered by another issuer which CWGA believed would help in sales of Target's insurance. The agreement between CWGA and Target did not forbid sale of non-competing, complementary insurance products along with the primary insurance offered through Target.

Sales declined in late 1998 and early 1999, prompting Target to offer new products which were in direct competition with the complementary products that CWGA was already selling. CWGA refused to sell the additional Target products believing them inferior to those already offered by CWGA from other issuers.

By letter dated April 13, 1999, Target sent CWGA notice of termination of the agreement effective immediately. Target sent copies of the letter to its principals, PFC and CBL. Gigante disputes the effect of the termination, asserting that the contract requires thirty days notice. A copy of the letter is attached to the AMJ.

By letter dated on or about April 14, 1999, Target sent notice to CWGA's subagents that the relationship between CWGA and Target was terminated. The letter also asked that all new business be sent directly to Target until further notice. Additionally, the letter invited subagents of CWGA to inquire about advancement in Target's corporation. A copy is also attached to the AMJ as an exhibit.

Plaintiff sues for breach of contract, tortious interference with contract, slander of title, violation of the Virginia Trade Secrets Act, and slander.

Plaintiff also seeks a judgment declaring the effectiveness of the termination of the agreement and Target's responsibilities to pay commissions despite termination. The court addresses each count in turn.

In Count I, entitled Breach of Contract, Plaintiffs allege that the required thirty-day notice for termination was not given and, thus, "the termination never became effective or alternatively did not become effective until May 13, 1999." Defendants characterize the action as one for wrongful termination. Defendants assert that no action for wrongful termination lies because the terms of the contract allow for termination with or without cause. Furthermore, Defendants contend that if thirty days notice was required, then the letter sent April 13, 1999, was effective notice terminating the contract no later than May 13, 1999.

Count I, however, does not base the entire cause of action for breach upon wrongful termination. In addition to the termination argument, Plaintiffs, in Count I, allege that the agreement requires that CWGA receive payment, notwithstanding the agreement's termination. CWGA asserts that it has not received payment and, thus, that Defendants have failed to respect the terms of the agreement. Additionally, Plaintiffs allege that Defendants are wrongfully keeping Plaintiffs from servicing the policies generated by CWGA and its subagents. The date of termination may be relevant to the issue of damages and not simply to a question of wrongful termination. Therefore, a cause of action is sufficiently alleged, and the demurrer to Count I is overruled.

Count II is entitled Declaratory Judgment and alleges that a dispute exists as to the effectiveness of Defendants' termination of the agreement with Plaintiffs. The count also asserts that, despite the effect of termination, a dispute exists as to whether Defendants are still required to pay commissions to Plaintiffs after termination.

Demurring to Count II, Defendants incorporate their argument offered in their demurrer to Count I, and the demurrer to Count II is overruled to the extent it reasserts those arguments. Defendants add that the AMJ alleges a completed occurrence and that a breach of contract claim is proper when a party seeks damages for the consequences of past conduct but not a declaratory judgment action.

The court looks to the explanation of the Act's purpose in *Liberty Mutual Ins. Co. v. Bishop*, 211 Va. 414 (1970). There, the Supreme Court explained:

> The intent of the declaratory judgment statutes is not to give parties greater rights than those which they previously possessed, but to permit the declaration of those rights before they mature. In other

words, the intent of the act is to have courts render declaratory judgments which may guide parties in their future conduct in relation to each other, thereby relieving them from the risk of taking undirected action incident to their rights, which action, without direction, would jeopardize their interests. This is with a view rather to avoid litigation than in aid of it.

*Id.* at 421. Earlier in the same case, the Supreme Court also expounded:

The test of the applicability of the statute is the determination of the existence of an actual controversy. The manifest intention of the legislature . . . was to provide for a speedy determination of actual controversies between citizens, and to prune, as far as is consonant with right and justice, the dead wood attached to the common law rule of "injury before action" and a multitude of suits to establish a single right.

The fact that multiplicity of actions may be avoided if a declaratory judgment be granted is not always a ground for assuming jurisdiction. There must be some real necessity for the exercise of jurisdiction on such ground. It must be made to appear that there is no adequate remedy at law as practical and effective to attain the ends of justice, as may be accomplished in a court of equity, and that the questions of law and fact involved are common to each of the several actions.

*Id.* at 419 (internal quotations and citations omitted).

Plaintiffs' action arises, in part, from a completed breach of contract. Here, a judgment in favor of Plaintiffs on the issues surrounding termination would provide full relief on that claim. Similarly, a judgment favorable to Plaintiffs in the breach of contract action would compensate Plaintiffs for unpaid, past commissions.

However, in the event that Plaintiffs prove their claim that Defendants must continue to pay future commissions, the action for breach of contract will not compensate Plaintiffs fully here. Only a declaration of Plaintiffs' rights under the contract can protect the parties from the costs of future litigation of a controversy which may properly be decided in this action. A declaratory judgment now would also promote judicial economy and convenience to the parties since the factual support for the judgment would be before the court in addition to all necessary parties. *See generally Erie Ins. Group v. Hughes*, 240

Va. 165 (1990). Therefore, a plea for a declaratory judgment is proper, and the demurrer to Count II is overruled.

Count III is entitled Tortious Interference with Contract. The count alleges that Defendants' letter sent to Plaintiffs' subagents attempted to improperly influence them to end their contracts with Plaintiffs and to work exclusively for Defendants. Furthermore, the count alleges that Defendants' action prevented Plaintiffs from gaining new commissions, harmed Plaintiffs' ability to sell those products which were not from Defendants' company, and damaged Plaintiffs' commercial reputation.

Defendants argue that Plaintiffs have not sufficiently alleged tortious interference because the AMJ does not allege that any subagent breached or terminated its contract with Plaintiffs. Also, Defendants argue that the AMJ is insufficient because each subagent contract is at-will, and interference with an at-will contract must involve an "improper method" which is "illegal or independently tortious." *See Perk v. Vector Resources Group, Ltd.*, 253 Va. 310, 314-15 (1997).

In Virginia, a claim for tortious interference of contract must allege:

> (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Perk*, 253 Va. at 314 (*quoting Duggin v. Adams*, 234 Va. 221, 226 (1987), and *Chaves v. Johnson*, 230 Va. 112, 120 (1985)). "Upon demurrer, the test of the sufficiency of a motion for judgment is whether it states the essential elements of a cause of action . . . ." *Lyons v. Grether*, 218 Va. 630, 633 (1977) (*citing Grubbs v. National Life etc. Co.*, 94 Va. 589, 591 (1897)).

Here, the AMJ does not contain an allegation that any contract was actually breached or terminated by any subagent. Allegations or inferences that Defendants disrupted or strained Plaintiffs' contractual relations with other parties do not rise to pleas of breach or termination. As demonstrated in *Perk*, such a breach is an essential element to a cause of action for tortious interference with contract. Lacking the allegation of breach or termination, the AMJ does not sufficiently allege the facts needed to support the cause of action, and the demurrer to Count III is sustained.

Count IV is entitled Slander of Title and seeks damages for statements made in the April 13 letter from Defendants to Plaintiffs, which Defendants

subsequently sent to their principals, PFC and CBL. Plaintiff alleges that Defendants published the letter when they sent it to their principals and that the publication caused the principals to treat the subagents as their own agents. The harm the Plaintiffs claim they suffered was both lost commissions and treatment of the subagents as direct agents for the principals.

While slander of title is a recognized cause of action in Virginia, the Supreme Court of Virginia has only addressed the tort in terms of economic damage to interests in real property and improvements thereon. *See Donohoe Constr. Co. v. Mount Vernon Assocs.*, 235 Va. 531 (1988); *see also Wright v. Castles*, 232 Va. 218 (1986); *Chagnon v. Hofferman*, 230 Va. 176 (1985). The Restatement (Second) of Torts includes slander of title under the broader topic of injurious falsehood. Generally, the rule in injurious falsehoods holds that one who publishes a falsehood is liable for pecuniary loss to another if:

(a) He intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) He knows that the statement is false or acts in reckless disregard of its truth or falsity.

§ 623A.

The injurious falsehoods which fall into the subcategory of slander of title are separately addressed in § 624 of the Restatement (Second). Comment (a) to § 624 states that "slander of title" is a "particular form of injurious falsehood that involves disparagement of the property in land, chattels, or intangible things." Comment (c) describes the legally protected interests as:

[a]ny kind of legally protected interest in land, chattels, or intangible things . . . if the interest is transferable and therefore salable or otherwise capable of profitable disposal. It may be real or personal, corporeal or incorporeal, in possession or reversion. It may be protected either by legal or equitable proceedings and may be vested or inchoate. It may be a mortgage, lease, easement, reversion or remainder, whether vested or contingent, in land or chattels, a trust or other equitable interest. It may be a patent right, a copyright or the right to use a trademark or trade name. It may be intangible property, whether represented and embodied in a document, negotiable or otherwise, or consisting of a simple debt or other cause of action.

Comment (c) continues:

> This does not purport to be a complete catalogue of legally protected interests in land, chattels and intangible things capable of disparagement. There may be other interests recognized by the law of property that are salable or otherwise capable of profitable disposal and to which the rule stated in this Section is therefore applicable.

Hence, in order to assert a claim for slander of title, Plaintiffs must allege a property interest recognized in the law which is salable or otherwise capable of profitable disposal.

Here, Plaintiffs assert a property right in addition to its contractual right in its agency relationship with each subagent. Clearly, the Thirteenth Amendment to the federal constitution would defeat a property right in the agents themselves to the extent the AMJ may be construed to assert such a right. So, Defendants argue that Plaintiffs' only interests arise through contract and, therefore, cannot also be interests in property.

The existence of a contract, however, often evidences transfer of interests in property, examples of which are seen in Restatement (Second) of Torts, § 624, comment (c) quoted above, such as the right to use a trademark or copyright. The agency relationships alleged here, however, are not property interests, "salable or otherwise capable of profitable disposal." To the extent the agency relationships are assignable, Plaintiffs' rights arise under contract, not property. *See, e.g.,* Restatement (Second) of Contracts § 317 (1979). Therefore, no cause of action for slander of title lies under the allegations in Count IV, and the demurrer is sustained as to that count.

Count V of the AMJ alleges a violation of the Virginia Trade Secrets Act. The AMJ states that Plaintiffs trained their subagents and maintained the list of agents as confidential. Plaintiffs further allege that they disclosed the list to Defendants and to Defendants' principals for the processing of policies and commissions. The identity of the subagents on the list, Plaintiffs continue, has "independent economic value from not being generally known to or being readily accessible by proper means to other persons" who could exploit the subagents' skills. Plaintiffs assert that Defendants, fully aware of a duty to maintain the list's secrecy and to limit its use, have misappropriated the list to contact the subagents directly and solicit policies for insurers on behalf of Defendants.

Defendants begin their argument by assuming, solely for the purposes of demurrer, that the list is a trade secret and that Defendants had a duty to maintain its secrecy or to limit its use. Defendants argue that they have honored their duty to maintain secrecy by not revealing the list to any other person or entity, which is supported by the allegations in the AMJ. Defendants

also assert that they properly limited the use of the list, under the facts as alleged in the AMJ, by notifying the subagents of the termination of representation by Plaintiffs and of the need to submit future business directly to Defendants. Defendants characterize the notice as a permissible, limited use, and not a misappropriation under the statute.

The Code section to which the parties refer is found in Chapter 26 of Title 59.1 and is entitled "Uniform Trade Secrets Act." In Virginia Code § 59.1-336, the Act defines "misappropriation" as:

> [d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .

In light of Defendants' assumptions, the issue becomes whether the AMJ and its attachments sufficiently allege an inappropriate use of the allegedly privileged information.

The letter sent to each subagent leads to an inference that the information may have been misused. The letter not only notifies the subagents of the change in the parties' relationship, but also invites the subagents to inquire into separate employment opportunities with Defendants. While the AMJ does not sufficiently allege that any subagent actually breached or terminated an agency contract with Plaintiffs, the AMJ does sufficiently allege that Defendants may have exceeded the scope of their permitted use of the information. The demurrer to Count V is overruled.

The final count, numbered Count "IV," is in fact Count VI and is entitled "Slander." In support of the count, Plaintiffs allege that Defendants' letters to the subagents falsely stated that Defendants terminated their relationship with Plaintiffs, as the termination was either not effective or not yet effective. The language Plaintiffs quote is that Plaintiffs' "offices no longer represent [Defendants and their principals]." Plaintiffs further allege that the letter reasonably leads to an inference that Plaintiffs committed some unlawful or unethical act because of the abruptness of the termination. The AMJ continues that Defendants acted recklessly disregarding the truth while knowing the subagents would make such an inference.

Alternatively, Plaintiffs assert that Defendants acted negligently. Plaintiffs assert a claim of presumed damages for prejudice in their profession and for special damages for the lost commissions and disruption of relationships with subagents.

Citing *The Gazette, Inc. v. Harris*, 229 Va. 1 (1985), and *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1 (1954), Defendants argue that the statement to which Plaintiffs refer did not cause substantial danger to Plaintiffs' reputation. Defendants also contend that the statement did not carry a clear imputation that Plaintiffs acted unlawfully or unethically.

As noted among the cases which Defendants cite:

> [I]n an action brought by a private individual to recover actual, compensatory damages for a defamatory publication, the plaintiff may recover upon proof by a preponderance of the evidence that the publication was false, and that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based.

*The Gazette*, 229 Va. at 15. The Court continued:

> The application of this negligence standard is expressly limited, however, to circumstances where the defamatory statement makes substantial danger to reputation apparent. The trial judge shall make such determination as a matter of law. If, on the other hand, no substantial danger to reputation is apparent from the statement in issue, *New York Times* malice must be established to recover compensatory damages.

*Id.* "*New York Times* malice" is evident when the statement is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 8 (*quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

Here, Plaintiffs have alleged that the statement as to termination was false, and "that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the [statement of termination] was based." *See The Gazette* at 15. The allegations that Defendants knew of the correct procedure for termination, ignored it, and then abruptly announced to Plaintiffs' subagents of the immediate termination provide support for such a finding sufficient to survive demurrer. Thus, Plaintiffs have alleged malice sufficiently to support a verdict for presumed damages.

The question of substantial danger to reputation arises if Plaintiffs only prove that Defendants acted negligently instead of with malice. *See id.* If

defendants are found to have acted negligently, Plaintiff would only be entitled to actual or compensatory damages. *See Shenandoah Publishing House, Inc. v. Gunter*, 245 Va. 320, 324 (1993). Without further explanation or evidence on the topic, the court must find all reasonable inferences in favor of the pleading. *See CaterCorp*, 246 Va. 22 (1993).

The court cannot find that a reasonable author in Defendants' position would not ascertain a substantial danger to Plaintiffs' commercial reputation because the court is not equipped to discern what effect such an announcement by Defendants might have upon Plaintiffs in the insurance field. The court finds that the allegation is sufficient to raise the issue of whether Defendants reasonably could ascertain a substantial danger to Plaintiffs' reputation. Therefore, the demurrer to the final count entitled Slander is overruled.

It is, therefore, ordered that Defendants Target, Inc.'s, and Brett E. Fields' Demurrer to the Amended Motion for Judgment is sustained as to Count III for Tortious Interference with Contract and Count IV for Slander of Title, and is overruled as to the remaining counts. As amendment has already been granted, further amendment is denied.