COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Frank and Senior Judge Coleman
Argued at Alexandria, Virginia


STEPHEN DAN TRIMBLE
                                              MEMORANDUM OPINION[*] BY
v.      Record No. 2394-09-4                  JUDGE LARRY G. ELDER
                                                  APRIL 27, 2010
PAULA SHAKI TRIMBLE


                FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                          Dennis J. Smith, Judge

        Douglas E. Milman (Wexell Milman, on briefs), for appellant.

        Cary S. Greenberg (Caroline E. Costle; GreenbergCostle, PC, on
        brief), for appellee.


        Stephen Dan Trimble (husband) appeals from a declaratory judgment action determining

the meaning of a particular provision of a property settlement agreement he entered into with his

former spouse, Paula Shaki Trimble (wife), in the course of their divorce and division of

property.  Husband contends the trial court erred in concluding a justiciable controversy existed

when wife filed her complaint for declaratory relief and in overruling his demurrer.  He also

contends the trial court erroneously concluded the plain meaning of the parties' agreement

relieved wife of her obligation to pay him the amount specified in the agreement if the net

proceeds from the sale of the marital residence were insufficient to provide that amount.  We

hold wife's complaint presented a controversy justiciable under Virginia's declaratory judgment

statutes and, thus, that the trial court properly overruled husband's demurrer.  We also hold the

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

trial court erroneously construed the parties' property settlement agreement.  Thus, we affirm in part, reverse in part, and remand for additional proceedings.

I.

BACKGROUND

The parties were married in 1999, had a child in 2004, and separated in 2005.  Thereafter, they entered into a property settlement agreement (the agreement), which they signed on July 21, 2006.

An appraisal of the marital residence indicated the property had a value of $645,000, and the parties determined that dividing the equity evenly would give each spouse a share of $148,495.  Based on that information, the agreement provided as follows with regard to the division of the marital residence:

> In exchange for the equities contained in this Agreement, the marital residence shall become the sole and separate property of [wife].  *[Wife] shall purchase [husband's] equity in the residence. [Husband's] equity in the residence shall be defined as the sum of $148,495, which amount shall be payable no later than June 1, 2009.*  This payment constitutes a division of marital property . . . .

> No later than the date of the execution of this Agreement, [husband] shall execute a general warranty deed transferring all of his right, title and interest in the marital residence to [wife].  [Wife] thereafter shall be solely responsible for, and shall indemnify and hold [husband] harmless from, the principal and interest payments on the existing and refinanced mortgages, real estate taxes, homeowner's insurance, utilities, and any other expenses associated with the marital residence.

> If [wife] fails to pay [husband] the sum set forth above by June 1, 2009, [wife] shall list the marital residence for sale as soon as possible thereafter . . . .  If the parties cannot agree on a list price, the parties shall list the house at the price suggested by the broker . . . .  Upon the presentation of any contract to purchase the marital residence [that meets certain conditions], [wife] shall accept and execute such contract forthwith.  Failure by [wife] to promptly execute a contract conforming to the foregoing terms shall constitute a material breach of this Agreement.

Upon sale, the net proceeds, which shall be defined as the sale price, minus the outstanding balance on the existing mortgage, and minus the costs of sale, shall be divided as follows: [Husband] shall receive $148,495 minus one-half the costs of the refinancing if the house is refinanced or of closing costs related to the sale if the house is sold, and [wife] shall receive the remaining net proceeds. . . . If the sale price is insufficient to cover the outstanding balance on the existing mortgage and the costs of sale, the shortfall shall be [wife's] sole responsibility. [Wife] shall pay all of any such shortfall at closing, and shall indemnify and hold [husband] harmless from same. . . .

(Emphasis added).

The parties were divorced by final decree entered April 12, 2007, which affirmed, ratified and incorporated, but did not merge, the parties' property settlement agreement.

On February 26, 2009, wife filed a complaint asking the court "to issue a declaratory judgment that the [property settlement agreement] contract between [husband and wife] does not require [wife] to pay [husband] more than the net proceeds of the sale, as that term is defined in [the agreement]." Wife alleged therein that in seeking to refinance the marital residence in late 2008 in order to pay husband pursuant to the agreement, she obtained an appraisal of $460,000 and a loan commitment for a new loan in the amount of $424,297. She also alleged that given the outstanding mortgage obligation and various prepayments and closing costs, this transaction would yield less than half the $148,495 amount due husband pursuant to the first paragraph of section 7 of the parties' agreement. She alleged further that in anticipation of the June 1, 2009 date by which the agreement required her to pay husband $148,495 or list the property for sale, she contacted a real estate broker and was told that the property likely would sell for even less than the appraised value, which would yield a net sum even lower than if she refinanced.

Finally, wife alleged that she and husband disagreed regarding whether the agreement required her to be financially responsible for any shortfall between the net sale proceeds and the amount of $148,495 defined in the agreement as husband's equity share. Wife argued that upon

the sale of the property, "[husband] is entitled to receive money out of the net proceeds of the sale but cannot pursue [wife] for the difference between the net proceeds and $148,495 (minus one-half of the costs of sale, as defined in the Agreement)." She averred husband argued she owed him "$148,495 minus one-half of the closing costs, as those costs are defined in the Agreement, *irrespective of the net proceeds*." (Emphasis added).

Husband filed a demurrer, contending no justiciable controversy existed because wife had not yet "breach[ed] the parties' agreement by not paying [husband] the $148,495 that he is due to receive by June 1, 2009." The trial court overruled the demurrer and conducted a hearing on the merits, at which both parties agreed the contract was unambiguous but disagreed over its meaning. Husband's attorney argued that section 7 paragraph 1's reference to the $148,495 determined the amount wife was obligated to pay husband and that paragraph 4's provisions concerning sale allowed the reduction of that amount only by the amount of closing costs if the property was sold. The trial court asked husband's attorney about the final paragraph, observing that "[n]owhere in that last paragraph does it say upon sale of the property that [wife] is to pay [husband] anything. It says the proceeds are to be divided." Husband argued the court "has to read the [a]greement as a unified whole" and that it "already defines the amount of money due from [husband] to [wife] [sic]." Focusing on the final paragraph, the trial court ruled as follows:

> [Y]ou have a sentence which specifically says if there is a shortfall with the mortgage, this is what is going to happen. There is nothing in there which says if there is a shortfall with respect to [husband's] amount, this is going to happen.
>
> *   *   *   *   *   *   *
>
> . . . They specifically did write in words about shortfalls, which indicates that it's contemplated that shortfalls were considered in it, and that's why that rule applies, that when you include one, you exclude others.

- 4 -

The trial court entered an order in keeping with its ruling from the bench, holding that wife would not be responsible to husband for any shortfall.

Husband noted his appeal to the Supreme Court of Virginia, which transferred the appeal to the Court of Appeals.

II.

ANALYSIS

A.

REQUEST FOR DECLARATORY RELIEF

"A demurrer . . . tests the sufficiency of factual allegations to determine whether the [pleading upon which the proceeding was instituted] states a cause of action." Fun v. Va. Mil. Inst., 245 Va. 249, 252, 427 S.E.2d 181, 183 (1993). Where the allegations in the pleading, accepted as true, fail to state a cause of action upon which relief can be granted, the pleading should be dismissed on demurrer. Tronfield v. Nationwide Mut. Ins. Co., 272 Va. 709, 712, 636 S.E.2d 447, 449 (2006). For example, where a plaintiff "ha[s] no right of action at the time of bringing the suit, . . . [a] demurrer [to the suit] [is] rightly sustained." Keyser v. Renner, 87 Va. 249, 250-51, 12 S.E. 406, 406 (1890).

Code § 8.01-184 provides as follows:

> In cases of actual controversy, circuit courts within the scope of their respective jurisdictions shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed and no action or proceeding shall be open to objection on the ground that a judgment order or decree merely declaratory of right is prayed for. *Controversies involving the interpretation of deeds, wills, and other instruments of writing*, statutes, municipal ordinances and other governmental regulations, *may be so determined, and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right*.

(Emphases added).

- 5 -

The legislature has expressly provided that the declaratory judgment statutes, Code §§ 8.01-184 to -191, are "to be liberally interpreted and administered with a view to making the courts more serviceable to the people." Code § 8.01-191; see Bd. of Supers. v. Southland Corp., 224 Va. 514, 297 S.E.2d 718 (1982). Our Supreme Court has made clear that Virginia's declaratory judgment statutes "provide a mechanism for resolving uncertainty in controversies regarding legal rights, without requiring one party to invade the asserted rights of another in order to permit an ordinary civil action for damages. A declaratory judgment action, which is preventive relief, may only be obtained when an actual controversy exists." Bell v. Saunders, 278 Va. 49, 54, 677 S.E.2d 39, 41 (2009) (citations omitted).

> The purpose of declaratory judgments . . . is to "supplement rather than to supersede ordinary causes of action and *to relieve litigants of the common law rule that no declaration of rights may be judicially adjudged until a right has been violated.*" Declaratory judgments provide relief from the uncertainties stemming from controversies over legal rights . . . .

Green v. Goodman-Gable-Gould Co., 268 Va. 102, 106-07, 597 S.E.2d 77, 80 (2004) (quoting Williams v. S. Bank of Norfolk, 203 Va. 657, 661-62, 125 S.E.2d 803, 806-07 (1962)) (citations omitted) (emphases added).

Fact-based issues related to events that have already occurred, such as whether a particular individual was negligent or was acting within the scope of his employment when he himself sustained certain injuries, ordinarily are not appropriate issues for resolution via a declaratory judgment action. USAA Cas. Ins. Co v. Randolph, 255 Va. 342, 347, 497 S.E.2d 744, 747 (1998). Legal rights, by contrast, are subject to determination by declaratory judgment if an action based on them has not already accrued or been resolved at the time the action is filed:

> The intent of the declaratory judgment statutes is not to give parties greater rights than those which they previously possessed, but to permit the declaration of those rights *before they mature.* In other words, the intent of the act is to have courts render declaratory judgments *which may guide parties in their future*

- 6 -

*conduct* in relation to each other, *thereby relieving them from the risk of taking undirected action incident to their rights*, which action, without direction, would jeopardize their interests. *This is with a view rather to avoid litigation* than in aid of it.

Liberty Mut. Ins. Co. v. Bishop, 211 Va. 414, 421, 177 S.E.2d 519, 524 (1970) (emphases added).

Applying these principles to the instant case, we hold the trial court properly concluded a controversy existed between the parties that was justiciable under Code § 8.01-184 and, thus, that the trial court's denial of husband's demurrer was proper. When wife filed the declaratory judgment action on February 26, 2009, she continued to reside in the marital residence with the parties' then four-year-old child and had not yet paid husband pursuant to the agreement. Wife averred she had attempted to refinance the property in late 2008 in an effort to pay husband but learned the appraised value of the property had decreased by almost thirty percent and that refinancing would no longer provide her with sufficient funds to pay him $148,495. The agreement provided wife was required to pay him "no later that June 1, 2009," and that if she had not paid husband by that date—a date less than four months after the date on which she filed the declaratory judgment action—she was compelled to list the residence for sale. Although the written agreement at least partially addressed the issue of how the sale would be conducted and the proceeds of the sale distributed, the declaratory judgment action averred the parties disagreed over whether wife would be personally responsible to husband for any shortfall between the net proceeds of the sale and the amount of his equity as listed in the agreement.

Under the principles set out above, this constituted an "actual antagonistic assertion and denial of right," Code § 8.01-184, ripe for declaratory judgment, and the trial court properly overruled husband's demurrer to wife's complaint for declaratory relief. Wife was not required to wait until she had breached the agreement, until husband was entitled to compel her pursuant to the agreement to put the house on the market, or until the house was sold and husband filed

suit against her for the amount of the likely shortfall, for a judicial ruling regarding the meaning of the agreement. How a court interpreted the sale provisions of section 7 was highly relevant to how wife might elect to proceed, and she risked suffering greater adverse consequences if she waited until after June 1, 2009 to take action. If liable for the full amount of $148,495 in the event of a forced sale, wife might have preferred to refinance the house prior to June 1, 2009, because she expected a refinancing would yield more money with which to pay husband the sum owed and she expressed a desire to keep the house in order to provide stability for her young child. Knowing in advance of June 1, 2009, whether she would be liable for the full amount would also have permitted her to take steps to raise the funds to cover the expected shortfall in some other manner, such as by liquidating retirement funds. If wife had waited until June 1, 2009, without acting, husband could have compelled the sale under the agreement even though the outcome might have been worse for wife if a court were later to conclude that she was, in fact, responsible for the shortfall.

Thus, we affirm the court's denial of husband's demurrer.

B.

MEANING OF THE AGREEMENT

Property settlement agreements are contracts subject to the same rules of formation, validity, and interpretation as other contracts. Stacy v. Stacy, 53 Va. App. 38, 44, 669 S.E.2d 348, 350 (2008) (en banc). "In construing the terms of a property settlement agreement, just as in construing the terms of any contract, we are not bound by the trial court's conclusions as to the construction of the disputed provisions." Smith v. Smith, 3 Va. App. 510, 513, 351 S.E.2d 593, 595 (1986). "If all the evidence which is necessary to construe a contract was presented to the trial court and is before the reviewing court, the meaning and effect of the contract is a

question of law which can readily be ascertained by this court." Fry v. Schwarting, 4 Va. App. 173, 180, 355 S.E.2d 342, 346 (1987).

In reviewing the agreement,

> It is the function of the court to construe the contract made by the parties, not to make a contract for them. The question for the court is what did the parties agree to as evidenced by their contract. The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares.

Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984) (quoting Meade v. Wallen, 226 Va. 465, 467, 311 S.E.2d 103, 104 (1984)). "'A court is not at liberty to rewrite a contract simply because the contract may appear to reach an unfair result.'" Rogers v. Yourshaw, 18 Va. App. 816, 823, 448 S.E.2d 884, 888 (1994) (quoting Kaufman v. Kaufman, 7 Va. App. 488, 501, 375 S.E.2d 374, 381 (1988)).

"When a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc., 276 Va. 285, 289, 662 S.E.2d 77, 80 (2008). "[T]he question whether a contract is ambiguous is not one of fact but one of law." Wilson, 227 Va. at 187, 313 S.E.2d at 398. "Contracts are not rendered ambiguous merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement." Id. Extrinsic evidence is not admissible unless the agreement is ambiguous. Smith v. Smith, 43 Va. App. 279, 287, 597 S.E.2d 250, 254 (2004).

Here, the parties agree that the challenged portions of section 7 of the contract are not ambiguous but disagree as to their meaning. We, too, hold the challenged language is not ambiguous and conclude the trial court erred in determining its meaning.

Paragraphs 1 and 2 of section 7 of the agreement,[1] executed July 21, 2006, expressly indicate the parties agreed on the amount of marital equity they had in the property at that time and how and when they would divide it.  The agreement clearly provides, "[Husband's] equity in the marital residence *shall be defined as* the sum of $148,495, *which amount shall be payable* no later than June 1, 2009."  (Emphases added).  Paragraph 2 provides that "No later than the date of the execution" of the agreement, July 21, 2006, "[husband] shall execute a general warranty deed transferring *all* of his right, title and interest in the marital residence to [wife]."  (Emphasis added).  Thus, the agreement unambiguously provides that on July 21, 2006, husband exchanged his interest in the marital residence for the right to receive from wife "the sum of $148,495 . . . no later than June 1, 2009."  From the date of execution of the agreement forward, wife alone bore the risk of loss of equity based on a decrease in value of the home.  Similarly, as the trial court expressly recognized, wife had the corresponding opportunity to benefit based on any increase in equity due to market forces or payment of the mortgage.

Wife relies on the provisions in paragraphs 3 and 4 which (a) require her to list the house for sale if she has not paid husband $148,495 by June 1, 2009; (b) detail the method for dividing the proceeds from a forced sale; and (c) provide (i) wife is "sole[ly] responsib[le]" for the shortfall "[i]f the sale price [in the forced transaction] is insufficient to cover the outstanding balance on the existing mortgage balance and the costs of sale" and (ii) wife shall "pay all of any such shortfall at closing[] and shall hold [husband] harmless from same."  Wife contends these paragraphs provide a *different* method for calculating the amount of money husband shall receive in the event of a forced sale and that she is not liable to husband for any shortfall under these circumstances.

---

[1] In the remainder of our analysis, we refer to the paragraphs of section 7 by number without further reference to the section in which they appear.

- 10 -

We disagree. We are cognizant of the trial court's reliance on the principle of contract construction, "*expressio unius est exclusio alterius*," which provides that "'if a [written instrument] covers particular or express matters, the intention may be inferred to exclude other subjects which the general words of the [instrument] may [otherwise] have been sufficient to include.'" Yukon Pocahontas Coal Co. v. Ratliff, 181 Va. 195, 203, 24 S.E.2d 559, 563 (1943) (construing a deed) (quoting 16 Am. Jur., at 537); see Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C., 269 Va. 315, 330, 609 S.E.2d 49, 56 (2005) (construing a contract). However, we disagree that viewing the shortfall language in paragraph 4 in light of this principle supports a different construction of the language in paragraph 1, which clearly defines the sum wife owes husband for his share of the equity as $148,495.

The language in paragraph 4 indicates how the proceeds of a forced sale are to be disbursed. That paragraph also details wife's obligation, in the event of a shortfall, to make payments to *certain third parties* and requires that wife shall indemnify and hold husband harmless from any such shortfall as against those third parties. That paragraph is *wholly silent* regarding wife's obligation to make any payment *directly to husband* in the event of a shortfall. Because paragraph 1 clearly defines the nature and amount wife owes husband as $148,495 and because the nature of the payment wife owes to husband, the other party to the contract, is clearly distinguishable from any indemnity payments wife may owe to third parties under any other contracts or instruments, we hold the principle of *expressio unius est exclusio alterius* does not apply. Paragraph 4 applies only to obligations to *third parties*, and thus, that paragraph's failure to mention wife's obligations *to husband* under the agreement does not indicate a modification of the payment terms clearly expressed in paragraph 1.

III.

For these reasons, we hold wife's complaint presented a controversy justiciable under Virginia's declaratory judgment statutes and, thus, that the trial court properly overruled husband's demurrer.  We also hold the trial court erroneously construed the parties' agreement, and we reverse and remand for additional proceedings consistent with this opinion.

Affirmed in part,
reversed in part,
and remanded.